## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| Patrick J. Semancik, II, | : | Case No. 1:13 CV 629 |
|     Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Commissioner of Social Security**,** | : | **REPORT AND** |
|     Defendant, | : | **RECOMMENDATION** |

## I. INTRODUCTION

Plaintiff Patrick J. Semancik, II ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. §

405(g) of Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying

his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under

Titles II and XVI, respectively, of the Social Security Act, 42 U.S.C. §§§ 416(i), 423, and 1381

(Docket No. 1). Pending are the parties' Briefs on the Merits (Docket Nos. 13 and 14) and Plaintiff's

Reply (Docket No. 15). For the reasons that follow, the Magistrate recommends the decision of the

Commissioner be affirmed.

1

## II. PROCEDURAL BACKGROUND

On August 26, 2009, Plaintiff filed an application for a period of DIB under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423 (Docket No. 12, p. 174 of 571). On that same day, Plaintiff filed an application for SSI under Title XVI of the Social Security Act, 42 U.S.C. § 1381 (Docket No. 12, p. 171 of 571). In both applications, Plaintiff alleged a period of disability beginning August 30, 2006 (Docket No. 12, pp. 171, 174 of 571). Plaintiff's claims were denied initially on March 1, 2010 (Docket No. 12, pp. 113, 117 of 571), and upon reconsideration on October 7, 2010 (Docket No. 12, pp. 122, 125 of 571). Plaintiff thereafter made a timely written request for a hearing on November 15, 2010 (Docket No. 12, p. 130 of 571).

On September 6, 2011, Plaintiff appeared with counsel for a hearing before Administrative Law Judge Ben Barnett ("ALJ Barnett") (Docket No. 12, pp. 36-90 of 571). Also appearing at the hearing was an impartial Vocational Expert ("VE") (Docket No. 12, pp. 62-84 of 571). ALJ Barnett found Plaintiff to have a severe combination of degenerative arthritis in the mid-back, peripheral neuropathy, bipolar disorder, post traumatic stress disorder (provisional), and mixed anxiety and depressed mood with an onset date of August 30, 2006 (Docket No. 12, p. 21 of 571).

Despite these limitations, ALJ Barnett determined, based on all the evidence presented, that Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through October 13, 2011, the date of his decision (Docket No. 12, p. 28 of 571). ALJ Barnett found Plaintiff had the residual functional capacity to perform medium work but was limited to simple, routine, and repetitive tasks involving no more than four steps and only superficial contact with the public and coworkers (Docket No. 12, p. 23 of 571). Plaintiff's request for benefits was therefore denied (Docket No. 12, p. 28 of 571).

On March 22, 2013, Plaintiff filed a Complaint in the Northern District of Ohio, Eastern Division, seeking judicial review of his denial of DIB and SSI (Docket No. 1). In his pleading, Plaintiff alleged multiple errors, including: (1) a violation of the treating physician rule; (2) a failure to properly to discuss the opinions of various medical sources; (3) an inaccurate residual functional capacity assessment; and (4) an inaccurate credibility finding (Docket No. 13). Defendant filed its Answer on June 5, 2013 (Docket No. 11).

### III. FACTUAL BACKGROUND

#### A. ADMINISTRATIVE HEARING

An administrative hearing convened on September 6, 2011, with ALJ Barnett presiding from St. Louis, Missouri (Docket No. 12, pp. 36-90 of 571). Plaintiff, represented by counsel Kirk B. Roose, appeared and testified from Cleveland, Ohio (Docket No. 12, pp. 41-62 of 571). Also present and testifying was VE Thomas F. Nimberger ("VE Nimberger") (Docket No. 12, pp. 62-84 of 571).

##### 1. PLAINTIFF'S TESTIMONY

At the time of the hearing, Plaintiff was forty-three years old (Docket No. 12, p. 41 of 571). Plaintiff testified that he graduated from high school, completed one semester of college, and had some vocational training (Docket No. 12, p. 42 of 571). He admitted that he used marijuana once per week, with his most recent use occurring only two days before the hearing (Docket No. 12, p. 57 of 571). Plaintiff testified that his driver's license had been revoked due to his failure to pay child support (Docket No. 12, p. 59 of 571). He last worked as a machinist in 2006 (Docket No. 12, p. 42 of 571).

Plaintiff gave testimony about a number of his alleged impairments, including his back and foot pain, fingertip numbness, and mental health issues. Plaintiff rated his back pain as a four to five out of a possible ten (Docket No. 12, p. 51 of 571). He noted that he does stretches, but no real physical

3

therapy exercises (Docket No. 12, p. 57 of 571). Plaintiff stated that a hot shower helped temporarily, as did switching positions and attempting to just sleep through the pain (Docket No. 12, p. 56 of 571). Plaintiff testified that he did not take pain medications and was fearful of them, given a friend's recent overdose (Docket No. 12, p. 56 of 571).

With regards to his hands, Plaintiff's testified that he was diagnosed with Reynaud's Syndrome, which left his hands always feeling cold and his fingertips numb (Docket No. 12, p. 48 of 571). Plaintiff stated that he could pick up coins and similar items but had difficulty doing anything that required fine dexterity (Docket No. 12, p. 49 of 571).

Plaintiff also testified about his mental health issues. He stated that he was diagnosed with depression and admitted to trying to commit suicide during a "low moment" (Docket No. 12, p. 53 of 571). Plaintiff stated that he was never treated with medication, but did see a psychologist (Docket No. 12, p. 54 of 571). Plaintiff requested that his case be closed out because he was not willing to comply with the psychologists' recommendation that he seek drug treatment (Docket No. 12, pp. 58-59 of 571). When asked, Plaintiff stated that he did not believe that his mental health issues affected his ability to concentrate or pay attention, but admitted that his brain would sometimes race (Docket No. 12, pp. 54-55 of 571). At the time of the hearing, Plaintiff was not receiving any kind of treatment for his mental health issues (Docket No. 12, p. 54 of 571).

With regard to his residual functional capacity, Plaintiff testified that he could stand on his feet for up to an hour and a half at a time, for a total of three hours per day (Docket No. 12, p. 44 of 571). He could sit for up to two hours, for a total of four to five hours per day (Docket No. 12, pp. 45-46 of 571). He uses a pillow at the small of his back for support (Docket No. 12, p. 47 of 571). Plaintiff stated that he spends his day alternating between various positions, including lying, sitting, and

4

standing, in an effort to alleviate his back pain (Docket No. 12, pp. 44-45 of 571). He testified that he has limitations with bending, lifting, and carrying, and tries not to lift or carry anything heavier than a case of soda (Docket No. 12, p. 50 of 571). When he does more, Plaintiff stated he feels pain for up to three to four hours afterward (Docket No. 12, p. 50 of 571). Plaintiff admitted going to physical therapy only once because the exercises hurt too much (Docket No. 12, pp. 51-52 of 571).

## 2.    VOCATIONAL EXPERT TESTIMONY

Having familiarized himself with Plaintiff's file and vocational background prior to the hearing, the VE described Plaintiff's past work as a lathe operator as medium and skilled and as a night hotel clerk as sedentary and skilled (Docket No. 12, p. 61 of 571).

ALJ Barnett then posed his first hypothetical question:

[A]ssume an individual of the claimant's age, education, and work experience who is limited to the full range of medium exertional work as defined in the Dictionary of Occupational Titles, limited to simple, routine, and repetitive tasks requiring no more than four steps, limited to superficial contact with the public and with coworkers. Could such an individual return to any of the past work you testified to?

(Docket No. 12, p. 62 of 571). Taking into account these limitations, the VE testified that such an individual would not be able to perform Plaintiff's past work (Docket No. 12, p. 62 of 571). However, the VE stated that there was other work that the individual could perform, including: (1) kitchen helper, listed under DOT[1] 318.687-010, for which there are 110,000 positions nationally and 1,000 in northeast Ohio; (2) janitor, listed under DOT 382.664-010, for which there are 95,000 positions nationally and 910 in northeast Ohio; and (3) laundry worker, listed under DOT 381.685-018, for which there are 81,000 positions nationally and 740 in northeast Ohio (Docket No. 12, p. 63 of 571).

ALJ Barnett then posed his second hypothetical question:

---

[1] Dictionary of Occupational Titles.

5

> [A]ssume an individual of the claimant's age, education, and work experience who is limited to the full range of light exertional work as defined in the Dictionary of Occupational Titles, must avoid all exposure to extreme cold, limited to simple, routine, and repetitive tasks, requiring no more than four steps, limited to work requiring no production rate or paced type work, and limited to brief and superficial contact with the public and with coworkers. Are there any jobs in the national economy for such an individual?

(Docket No. 12, p. 63 of 571). Based on these parameters, the VE testified that such an individual could do a variety of other jobs, including: (1) packager, listed under DOT 559.687-074, for which there are 88,000 positions nationally and 875 in northeast Ohio; 92) mail clerk, listed under DOT 209.687-010, for which there are 75,000 positions nationally and 790 in northeast Ohio; and (3) office cleaner, listed under DOT 323.687-014, for which there are 90,000 positions nationally and 900 in northeast Ohio (Docket No. 12, p. 64 of 571).

For his final hypothetical, ALJ Barnett stated:

> [A]ssume an individual of the claimant's age, education, and work experience, who cannot even engage in sedentary exertional work on a regular and consistent basis. That is, cannot lift up to [ten] pounds occasionally, cannot stand or walk for at least two hours out of an eight hour day, cannot sit for at least six hours out of an eight hour day. Are there any jobs in the national economy for such an individual?

(Docket No. 12, pp. 64-65 of 571). Based on these limitations, the VE answered in the negative (Docket No. 12, p. 65 of 571).

## C.    MEDICAL RECORDS

### 1.    PHYSICAL HEALTH

Plaintiff's medical records dealing with his back and spine issues date back to July 19, 2004, when Plaintiff underwent radiological testing. Scans showed mild arthritic changes in Plaintiff's cervical spine as well as minimal arthritic changes in his lumbosacral spine (Docket No. 12, p. 332 of 571). Plaintiff's records then jump to November 21, 2006, and Plaintiff's first appointment with Dr.

6

Peter Laszlo, MD ("Dr. Laszlo") (Docket No. 12, p. 336 of 571). Plaintiff complained of back pain and pain and numbness in both feet (Docket No. 12, p. 336 of 571). He also admitted that he was not taking the medications previously prescribed to him (Docket No. 12, p. 336 of 571). On December 1, 2006, radiological scans showed Plaintiff had mild degenerative changes in his mid and lower dorsal spine (Docket No. 12, p. 337 of 571). Scans of his lumbar spine were negative for any abnormality (Docket No. 12, p. 338 of 571). Plaintiff returned to Dr. Laszlo on December 26, 2006, complaining of pain and tenderness in his lower thoracic area (Docket No. 12, p. 335 of 571). Dr. Laszlo recommended physical therapy (Docket No. 12, p. 335 of 571).

Plaintiff's records are silent as to his alleged back pain issues until nearly four years later when, on April 10, 2008, Plaintiff was seen at Functional Physical Therapy (Docket No. 12, p. 405 of 571). At that time, Plaintiff rated his level of pain at a four out of a possible ten (Docket No. 12, p. 405 of 571). The physical therapist recommended both neuromuscual and therapeutic exercises, along with stretching (Docket No. 12, p. 406 of 571). Plaintiff had only one appointment, on April 29, 2008, after which records show that he discontinued treatment (Docket No. 12, p. 408 of 571).

On April 30, 2009, Plaintiff established care with Dr. W. Craig Eldrigde, MD ("Dr. Eldridge") (Docket No. 12, p. 484 of 571). Plaintiff reported smoking one-half pack of cigarettes per day, occasionally using alcohol, and smoking marijuana (Docket No. 12, p. 484 of 571). Plaintiff complained of bone spurs and stated that his primary purpose for the visit was to complete his required Medicaid renewal physical (Docket No. 12, p. 485 of 571). Following an evaluation, Dr. Eldridge told Plaintiff that he did not see anything that was considered a disability (Docket No. 12, p. 485 of 571). Plaintiff became very upset at this and stated that his back "sometimes hurt" (Docket No. 12, p. 485 of 571). On May 5, 2009, Plaintiff underwent radiological scans of his back. Plaintiff's cervical spine

7

showed minimal arthritic changes with no fracture or soft tissue swelling (Docket No. 12, pp. 438, 486 of 571). He had mild distal thoracic anterior wedging, which was unlikely acute, and a relatively normal lumbar appearance (Docket No. 12, pp. 439-40, 487-88 of 571).

Plaintiff's records then jump to December 22, 2010, when Plaintiff established care with Dr. Vamsee Amirneni, MD ("Dr. Amirneni") (Docket No. 12, p. 555 of 571). Plaintiff complained of moderate sharp pain and numbness in both feet (Docket No. 12, p. 555 of 571). He also reported a chronic history of upper and lower back pain (Docket No. 12, p. 555 of 571). Plaintiff stated that he did not take any medications for the pain, except for the occasional Tylenol, and reported that physical therapy did not help (Docket No. 12, p. 555 of 571). Plaintiff had a normal gait, muscle strength, and tone (Docket No. 12, p. 557 of 571). He had tenderness in his mid-thoracic spine and mild paraspinal tenderness in his upper lumbar spine region (Docket No. 12, p. 557 of 571). Radiology scans of Plaintiff's thoracic and lumbar spine done on February 14, 2011, were normal (Docket No. 12, p. 560 of 571).

Plaintiff returned to Dr. Amirneni on February 15, 2011, complaining of almost constant pain in his mid and lower back (Docket No. 12, p. 552 of 571). Dr. Amirneni recommended physical therapy, but Plaintiff declined (Docket No. 12, p. 554 of 571). On March 11, 2011, Plaintiff underwent a Pulse Volume Recorder ("PVR") rest/exercise study of his lower extremities (Docket No. 12, p. 559 of 571). The study showed no significant large vessel peripheral vascular disease but could not rule out small vessel disease (Docket No. 12, p. 559 of 571). Plaintiff returned to Dr. Amirneni on March 22, 2011, still complaining of pain, tingling, and numbness in his bilateral feet (Docket No. 12, p. 548 of 571). He stated that he had significant pain in his arches if he stood or walked for an hour (Docket No.

12, p. 548 of 571). Plaintiff was diagnosed with possible peripheral neuropathy (Docket No. 12, p. 551 of 571).

### 1.    MENTAL HEALTH

Plaintiff first reported to the Nord Center on March 27, 2007, as a self-referral complaining of depressed affect, difficulty falling asleep, and intrusive worry thoughts (Docket No. 12, p. 348 of 571). He attributed most of his symptoms to his unresolved romantic feelings towards a former girlfriend, with whom he had a child (Docket No. 12, p. 348 of 571). Plaintiff stated he had been to the Nord Center once before with suicidal ideations after a breakup with the same woman (Docket No. 12, p. 348 of 571). Plaintiff alleged feeling hopeless almost every day and claimed he mostly slept to "escape from life" (Docket No. 12, p. 348 of 571). He reported a history of adult misdemeanor and felony charges, including driving under suspension, minor theft, and felony drug trafficking of marijuana (Docket No. 12, p. 352 of 571). Plaintiff also admitted past cocaine use and current alcohol and marijuana use (Docket No. 12, p. 361 of 571). Nord Center staff reported that Plaintiff presented as agitated with rapid speech, although his thoughts were logical (Docket No. 12, p. 360 of 571). Plaintiff seemed anxious and his insight and judgment were poor (Docket No. 12, p. 360 of 571). Plaintiff was diagnosed with an adjustment disorder with mixed anxiety and depressed mood, alcohol use (provisional), and assigned a Global Assessment of Functioning[2] ("GAF") score of sixty (Docket No. 12, pp. 357-58 of 571).

Plaintiff returned to the Nord Center only a handful of times over the next few months. Notes

---

[2] The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A score of sixty indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (hereinafter DSM-IV) 34 (Am. Psychiatric Ass'n) (4th ed. 1994).

from his April 25, 2007, appointment state that Plaintiff refused to consider stopping his marijuana use (Docket No. 12, pp. 366, 514 of 571). On July 17, 2007, Plaintiff requested that his case be closed, since he did not agree with staff recommendations that he seek drug treatment (Docket No. 12, p. 431 of 571). Plaintiff's case with the Nord Center was officially closed on September 18, 2007, due to non-compliance and a refusal to engage with treatment (Docket No. 12, pp. 428-29 of 571).

Although there are no treatment records, Plaintiff apparently sought counseling from Dr. Thomas F. Zeck ("Dr. Zeck") on three occasions in May and June 2009 (Docket No. 12, p. 510 of 571). On May 16, 2011, Dr. Zeck provided Plaintiff's counsel with a summary of these appointments (Docket No. 12, pp. 510-12 of 571). Dr. Zeck noted that Plaintiff appeared rather unkempt and his hygiene was fair (Docket No. 12, p. 511 of 571). Plaintiff was hyperactive, almost to the point of being manic, and was rather anxious and negative (Docket No. 12, p. 511 of 571). Dr. Zeck assessed Plaintiff's insight and judgment to be fair and his speech pressured (Docket No. 12, p. 511 of 571). Plaintiff reported that he became easily aggravated and had no patience, cried frequently, and got irritated with others, especially his mother (Docket No. 12, p. 511 of 571). Dr. Zeck noted that Plaintiff was a "negative, pessimistic individual who had nothing positive to say about anybody or any situation" (Docket No. 12, p. 511 of 571). During his three sessions, Plaintiff was overactive and had difficulty sitting still and focusing (Docket No. 12, p. 511 of 571). Dr. Zeck reported that Plaintiff just wanted to share his negative feelings about himself and those in his life without actually wanting to work on those issues (Docket No. 12, p. 511 of 571). Dr. Zeck provisionally diagnosed Plaintiff with bipolar disorder and post traumatic stress disorder ("PTSD") (Docket No. 12, p. 512 of 571).

10

**D.      EVALUATIONS**

**1.      PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENTS**

Plaintiff underwent a Physical Residual Functional Capacity Assessment with state examiner Dr. Esberdado Villanueva, MD ("Dr. Villanueva") on September 15, 2007 (Docket No. 12, pp. 395-402 of 571). Dr. Villanueva found Plaintiff could: (1) occasionally lift and/or carry fifty pounds; (2) frequently lift and/or carry twenty-five pounds; (3) stand and/or walk for a total of six hours during an eight-hour workday; (4) sit for a total of six hours during an eight-hour workday; and (5) engage in unlimited pushing and pulling (Docket No. 12, p. 396 of 571). Plaintiff could never climb ladders, ropes, or scaffolds, but otherwise had no postural, manipulative, visual, communicative, or environmental limitations (Docket No. 12, pp. 397-99 of 571).

Plaintiff underwent a second Physical Residual Functional Capacity Assessment on February 22, 2010, with state examiner Dr. Teresita Cruz, MD ("Dr. Cruz") (Docket No. 12, pp. 499-506 of 571). Dr. Cruz found Plaintiff could: (1) occasionally lift and/or carry fifty pounds; (2) frequently lift and/or carry twenty-five pounds; (3) stand and/or walk for a total of six hours during an eight-hour workday; (4) sit for a total of six hours during an eight-hour workday; and (5) engage in unlimited pushing and pulling (Docket No. 12, p. 500 of 571). Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations (Docket No. 12, pp. 501-03 of 571).

**2.      PHYSICAL EVALUATIONS**

On August 17, 2007, Plaintiff saw Dr. Mehdi Saghafi ("Dr. Saghafi") at the request of the Bureau of Disability Determination ("BDD") (Docket No. 12, pp. 384-89 of 571). Plaintiff complained of lower back pain and numbness in his feet and ankles (Docket No. 12, p. 384 of 571). Upon examination, Dr. Saghafi found Plaintiff walked with a normal gait and was able to stand and walk on

his toes and heels (Docket No. 12, p. 384 of 571). Plaintiff had no gross deformity of the spinal column, although he had some limitation in raising his legs due to lower back pain (Docket No. 12, p. 384 of 571). Plaintiff had a negative Babinski sign[3] (Docket No. 12, p. 384 of 571). His manual scale muscle testing examination was largely normal (Docket No. 12, pp. 386-89 of 571). Dr. Saghafi concluded that Plaintiff could: (1) sit, stand, and walk for six to eight hours per day; (2) lift and carry fifteen to twenty-five pounds on a frequent basis; (3) lift and carry twenty-six to fifty pounds on an occasional basis; (4) push and pull objects; (5) manipulate objects; (6) operate hand and foot controlled devices; (7) drive a motor vehicle and travel; and (8) climb stairs (Docket No. 12, p. 385 of 571). Plaintiff's speech, hearing, memory, orientation, and attention were within a normal range (Docket No. 12, p. 385 of 571). He was limited in walking in colder weather (Docket No. 12, p. 385 of 571).

Dr. Saghafi conducted a second examination at the request of the BDD on January 15, 2010 (Docket No. 12, pp. 490-98 of 571). At the time of this evaluation, Plaintiff did not complain of any pain in his joints or numbness, tingling, or weakness in his extremities (Docket No. 12, p. 492 of 571). Again, Plaintiff's manual muscle testing evaluation was largely normal (Docket No. 12, pp. 495-98 of 571). Dr. Saghafi's conclusions were largely the same as they were in 2007 in that Plaintiff could: (1) sit, stand, and walk for six to eight hours per day; (2) lift and carry fifteen to twenty-five pounds on a frequent basis; (3) lift and carry twenty-six to fifty pounds on an occasional basis; (4) push and pull objects; (5) manipulate objects; (6) operate hand and foot controlled devices; (7) drive a motor vehicle and travel; and (8) climb stairs (Docket No. 12, p. 494 of 571). Plaintiff's speech, hearing, memory, orientation, and attention were within a normal range (Docket No 12, p. 494 of 571).

---

[3] Loss of or diminished Achilles tendon reflex in sciatica. TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011).

### 3. BASIC MEDICAL EVALUATIONS

Both Drs. Laszlo and Amirneni completed basic medical evaluations for Plaintiff at the request of the Ohio Department of Job and Family Services ("ODJFS") (Docket No. 12, pp. 534, 546 of 571). On June 19, 2007, Dr. Laszlo concluded that Plaintiff could: (1) stand and/or walk for two hours during an eight-hour workday; (2) sit for two hours during an eight-hour workday; (3) frequently lift up to ten pounds; and (4) occasionally lift up to ten pounds (Docket No. 12, p. 534 of 571). Dr. Laszlo also found that Plaintiff was moderately limited in his ability to push, pull, and reach and was markedly limited in his ability to bend (Docket No. 12, p. 534 of 571).

On March 22, 2011, Dr. Amirneni concluded Plaintiff could: (1) stand and/or walk for two hours during an eight-hour workday; (2) sit for four hours during an eight-hour workday; (3) occasionally lift up to five pounds; and (4) frequently lift up to five pounds (Docket No. 12, p. 546 of 571). Dr. Amirneni also found that Plaintiff was moderately limited in his ability to push, pull, bend, and reach (Docket No. 12, p. 546 of 571).

### 4. MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

Plaintiff underwent a Mental Residual Functional Capacity Assessment with state examiner Dr. Alice Chambly, Psy.D ("Dr. Chambly") on October 28, 2009 (Docket No. 12, pp. 473-76 of 571). Dr. Chambly found Plaintiff was moderately limited in his ability to: (1) carry out detailed instructions; (2) work in coordination with or proximity to others without being distracted by them; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (4) interact appropriately with the general public; (5) accept instructions and respond appropriately to criticism from supervisors; (6) get along with coworkers or peers without distracting them or exhibiting

13

behavioral extremes; and (7) respond appropriately to changes in the work setting (Docket No. 12, pp. 473-74 of 571).

### 5.   PSYCHIATRIC REVIEW TECHNIQUES

Plaintiff also underwent a series of Psychiatric Review Techniques, the first being on July 7, 2007, with state examiner Dr. David Dietz, Ph.D ("Dr. Dietz") (Docket No. 12, pp. 368-81 of 571). Dr. Dietz was unable to make any findings due to Plaintiff's non-compliance with the evaluation (Docket No. 12, p. 380 of 571). Plaintiff's next examination occurred on August 2, 2008, with state examiner Dr. Katherine Lewis, Psy.D ("Dr. Lewis") (Docket No. 12, pp. 409-22 of 571). Dr. Lewis found Plaintiff had no medically determinable impairment (Docket No. 12, p. 409 of 571).

In conjunction with her Mental Residual Functional Capacity Assessment on October 28, 2009, Dr. Chambly also conducted her own Psychiatric Review Technique (Docket No. 12, pp. 459-72 of 571). Dr. Chambly concluded Plaintiff suffered from bipolar disorder and polysubstance abuse (Docket No. 12, pp. 462, 467 of 571). With regard to "Paragraph B"[4] criteria, Dr. Chambly determined that Plaintiff had a mild restriction in activities of daily living and moderate restrictions in maintaining social functioning and concentration, persistence, and pace, with no episodes of decompensation (Docket No. 12, p. 469 of 571). There was no evidence of "Paragraph C"[5] criteria (Docket No. 12, p. 470 of 571).

### 6.   PSYCHOLOGICAL EVALUATION

On August 21, 2007, Plaintiff underwent a psychological evaluation with state examiner Dr.

---

[4] Paragraph B criteria "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

[5] Paragraph C criteria also "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

Ronald G. Smith, Ph.D ("Dr. Smith") at the request of the BDD (Docket No. 12, pp. 391-94 of 571).

Plaintiff reported having sad spells, especially when he thought about his ex-girlfriend (Docket No. 12,

p. 393 of 571). He stated that he was able to sleep for six or seven hours without nightmares (Docket

No. 12, p. 494 of 571). When asked about daily activities, Plaintiff stated he would wake up, take a

shower, walk to the library, use the internet, buy cigarettes, and watch television (Docket No. 12, p.

393 of 571). Plaintiff also reported cleaning his house, washing dishes, and doing laundry (Docket No.

12, p. 393 of 571).

Plaintiff was cooperative and friendly during the evaluation and was coherent and verbally

fluent, not requiring much stimulation from Dr. Smith (Docket No. 12, p. 393 of 571). He was direct

and to the point and well-organized in his thinking (Docket No. 12, p. 393 of 571). Plaintiff showed

appropriate affective expression with a good range of affect and was alert and in good contact with

reality (Docket No. 12, p. 393 of 571). He was also well-oriented to time and place (Docket No. 12, p.

393 of 571). Dr. Smith reported that Plaintiff's ability to maintain attention and concentration, follow

one or two step job instructions, and relate to the public, coworkers, and supervisors was good (Docket

No. 12, pp. 393-94 of 571). Plaintiff was assigned a GAF score of fifty-eight[6] (Docket No. 12, p. 394

of 571).

## IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are

identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920.  *Colvin v.*

*Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  DIB and SSI are available only for those who have a

---

[6] A GAF score of fifty-eight indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV at 34.

15

"disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920. "Disability" is defined as the

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (citing 42

U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same

definition used in the SSI context).

　　　The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI

claim.  First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time

he seeks disability benefits. *Colvin*, 475 F.3d at 730 (citing *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th

Cir. 1990)).  Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at

730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do

basic work activities." *Id*. (citing *Abbott*, 905 F. 2d at 923).  At the third step, a claimant is presumed to

be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful

activity, has a severe impairment that is expected to last for at least twelve months, and the impairment

meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

　　　Prior to considering step four, the Commissioner must determine a claimant's residual

functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity

is an administrative "assessment of [the claimant's] physical and mental work abilities – what the

individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS

126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's maximum

remaining ability to do sustained work activities in an ordinary work setting on a regular and

continuing basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an

equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting* SSR 96-8p,

1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The

Commissioner must next determine whether the claimant has the residual functional capacity to

perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does,

the claimant is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the

claimant will not be considered disabled if other work exists in the national economy that he can

perform.  *Colvin*, 475 F.3d at 730 (citing *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir.

2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the

Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730

(citing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Barnett made

the following findings:

1.  Plaintiff meets the insured status requirements of the Social Security Act
    through December 31, 2010.

2.  Plaintiff has not engaged in substantial gainful activity since August 30, 2006,
    the alleged onset date.

3.  Plaintiff has the following severe impairments: degenerative arthritis in the mid-
    back, peripheral neuropathy, bipolar disorder, post traumatic stress disorder
    (provisional), and mixed anxiety and depressed mood.

6.  Plaintiff does not have an impairment or combination of impairments that meets
    or medically equals any of the impairments listed in 20 CFR Part 404, Subpart
    P, Appendix 1.

7.  Plaintiff has the residual functional capacity to perform medium work except
    that he is limited to simple, routine, and repetitive tasks involving no more than

four steps and superficial contact with the public and coworkers.

8.      Plaintiff is unable to perform any past relevant work.

9.      Plaintiff was born on September 4, 1968, and was 37-years old, which is defined as a younger individual age 18-49 on the alleged disability onset date.

10.    Plaintiff has at least a high school education and is able to communicate in English.

11.    Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that the Plaintiff is "not disabled" whether or not the Plaintiff has transferable job skills.

12.    Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff could perform.

13.    Plaintiff has not been under a disability, as defined in the Social Security Act, at any time from August 30, 2006, the alleged onset date, through October 13, 2011, the date of the decision.

(Docket No. 12, pp. 19-29 of 571). ALJ Barnett denied Plaintiff's request for DIB and SSI (Docket No. 12, p. 29 of 571).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832-33 (6th Cir. 2006). In conducting judicial review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)). "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

18

*McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)).

## VII. DISCUSSION

### A. PLAINTIFF'S ALLEGATIONS

In his Brief on the Merits, Plaintiff alleges the ALJ failed to: (1) adequately evaluate the opinions of Plaintiff's alleged treating physicians, Drs. Laszlo, Amirneni, and Zeck; (2) properly weigh the opinions of state examiners Drs. Smith, Chambly, and Warren; (3) incorporate all of Plaintiff's limitations in the residual functional capacity assessment; and (4) properly determine Plaintiff's credibility (Docket No. 13).

### B. DEFENDANT'S RESPONSE

Defendant disagrees and argues that the ALJ properly weighed all medical opinions and accounted for Plaintiff's limitations in formulating his residual functional capacity assessment (Docket No. 14). Defendant also argues that ALJ Barnett conducted a full credibility analysis (Docket No. 14).

### C. DISCUSSION

#### 1. TREATING PHYSICIAN RULE

In his first three assignments of error, Plaintiff alleges the ALJ failed to follow the treating physician rule with regard to Drs. Laszlo, Amirneni, and Zeck (Docket No. 13, pp. 5-12 of 19). The Sixth Circuit provided a detailed summary of the treating physician rule in *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). According to the Court, the treating physician rule:

> requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because these sources are likely to be the medical professional most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. *Wilson v.*

19

*Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoting* 20 C.F.R. § 404.1527(d)(2)).

> The ALJ must give a treating source opinion controlling weight if the treating source opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. *Wilson*, 378 F.3d at 544. On the other hand . . . it is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent . . . with other substantial evidence in the case record. *SSR* 96-2p, 1996 SSR LEXIS 9 at *5 (July 2, 1996). If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician. *Wilson*, 378 F.3d at 544.
>
> [T]he regulations require the ALJ to always give good reasons in the notice of determination or decision for the weight given to the claimant's treating source's opinion. 20 C.F.R. § 404.1527(d)(2). Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. *SSR* 96-2p, 1996 SSR LEXIS 9 at *12.

*Blakley*, 581 F.3d at 406-07 (internal quotations omitted). Here, ALJ Barnett discounted the opinion of Dr. Laszlo given its remoteness in time and reliance on Plaintiff's subjective statements, the opinion of Dr. Amirneni given the number of visits and reliance on Plaintiff's credibility, and the opinion of Dr. Zeck given the number of visits (Docket No. 12, pp. 25-26 of 571).

Before according any weight to the opinions of a claimant's physicians, the ALJ must first determine which physicians he will consider to be "treating sources." "A physician is a treating source if he has provided medical treatment or evaluation and has had an ongoing treatment relationship with the claimant . . . with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation that is typical for the treated conditions." *Blakley*, 581 F.3d at 407 (*quoting* 20 C.F.R. § 404.1502) (internal quotations omitted)).

20

Records indicate that Plaintiff saw Drs. Laszlo, Amirneni, and Zeck each on only three occasions: Dr. Laszlo from November 2006 through December 2006, Dr. Amirneni from December 2010 through March 2011, and Dr. Zeck from May 2009 through June 2009 (Docket No. 12, pp. 335-38, 510, 548-57 of 571). During his testimony, Plaintiff recalled seeing Dr. Laszlo only twice at a free clinic (Docket No. 12, p. 52 of 571). He also recalled seeing Dr. Amirneni, but when asked about their treatment relationship, Plaintiff stated ". . . nothing really that's relevant here except for he did take some x-rays, but mostly the things he's done were – since I'm new to him, I'm a new client, he pretty much did blood work and things like that, nothing that would affect us here" (Docket No. 12, pp. 52-53 of 571). There is no evidence in the record that either Drs. Laszlo or Amirneni prescribed Plaintiff medication for his back issues (Docket No. 12, pp. 335-38, 548-57 of 571). Most of the doctors' treatment notes focus on Plaintiff's subjective complaints of pain (Docket No. 12, pp. 335-38, 548-57 of 571). There is no evidence in the record as to why Plaintiff stopped seeing Dr. Laszlo or of any subsequent contact after the December 2006 visit, which is now nearly seven years ago. Additionally, there is no evidence that Dr. Amirneni ordered any additional testing for Plaintiff (Docket No. 12, pp. 548-57 of 571). The one suggestion that Dr. Amirneni did make, that Plaintiff participate in physical therapy, was disregarded by Plaintiff (Docket No. 12, p. 554 of 571). Given the minimal number of visits and lack of treatment history, neither doctor can be considered to be one of Plaintiff's treating physicians, as that term is defined by Social Security regulations. Therefore, neither the opinion of Dr. Laszlo or Dr. Amirneni is entitled to controlling weight.

The same is true for psychologist Dr. Zeck. Plaintiff's medical records do not even include notes from his actual appointments with the psychologist. Rather, this Court must rely upon a summary of these appointments written by Dr. Zeck in May 2011, two years after the three appointments

actually occurred and prepared for litigation purposes (Docket No. 12, pp. 510-12 of 571). During his testimony, Plaintiff claimed he had been seeing Dr. Zeck since 2006 (Docket No. 12, p. 54 of 571). A review of the records clearly shows that, while Plaintiff did have some mental health appointments in 2007, these appointments took place at the Nord Center, not with Dr. Zeck (Docket No. 12, pp. 348-431 of 571). There is likewise no indication as to why Plaintiff stopped seeing Dr. Zeck (Docket No. 12, pp. 510-12 of 571). Again, given the minimal number of visits and lack of treatment history, Dr. Zeck cannot be considered to be one of Plaintiff's treating physicians and his opinion is not entitled to controlling weight.

Since neither Drs. Laszlo, Amirneni, or Zeck can be considered Plaintiff's treating physicians, Plaintiff's first three assignments of error, alleging a violation of the treating physician rule, are without merit and the Magistrate recommends the decision of the Commissioner on this issue be affirmed.

### 2. MEDICAL SOURCE OPINIONS

In his next two assignments of error, Plaintiff alleges the ALJ failed to properly weigh and evaluate the opinions of state examiners Drs. Smith, Chambly, and Warren (Docket No. 13, pp. 12-15 of 19). Specifically, Plaintiff takes issue with ALJ Barnett's finding that Plaintiff was capable of completing tasks involving no more than *four* steps, rather than the one or two step tasks allegedly suggested by these state examiners (Docket No. 12, pp. 12-15 of 19). Plaintiff's claims essentially involve the ALJ's failure to accurately capture Plaintiff's residual functional capacity. As such, a brief discussion of residual functional capacity is helpful.

22

### a.   RESIDUAL FUNCTIONAL CAPACITY

To properly determine a claimant's ability to work and the corresponding level at which that work may be performed, the ALJ must determine the claimant's residual functional capacity. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). According to Social Security Regulations, residual functional capacity is designed to describe the claimant's physical and mental work abilities. *Id*. Residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a).

To determine a claimant's residual functional capacity, the Commissioner will make an assessment based on all relevant medical and other evidence. 20 C.F.R. § 20.1545(a)(3). The Commissioner bears the responsibility of developing the claimant's complete medical history. 20 C.F.R. § 20.1545(a)(3). The Commissioner "will consider any statements about what [a claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. [The Commissioner] will also consider descriptions and observations of [a claimant's] limitations from [his] impairment(s), including limitations that result from [his] symptoms, such as pain, provided by [claimant], [his] family, neighbors, friends, or other persons." 20 C.F.R. § 20.1545(a)(3). Responsibility for deciding residual functional capacity rests with the ALJ when cases are decided at an administrative hearing. *Webb*, 368 F.3d at 633.

### b.   MEDICAL SOURCES GENERALLY

To properly determine a claimant's residual functional capacity, the Commissioner must necessarily evaluate both medical and *opinion* evidence. Medical opinions are "statements from

physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite the impairment(s), and [his] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). While the Social Security Administration recognizes that the opinions of a claimant's treating physician(s) bear special significance and are sometimes entitled to controlling weight, the Commissioner has an obligation to examine opinions from *any* medical source on *any* issue, even those expressly reserved to the Commissioner. SSR 96-5p, 1996 SSR LEXIS 2, *4-6 (July 2, 1996); *see also* 20 C.F.R. §§ 404.1527(b), 416.927(b). "Because state agency consultants are experts in the Social Security Disability programs, the rules set forth in 20 C.F.R. §§ 404.1527(f) and 416.927(f) require an ALJ to consider the consultants' findings of fact about the nature and severity of a claimant's impairment(s) as opinions of non-examining physicians." SSR 96-6p, 1996 SSR LEXIS 3, *4-5 (July 2, 1996). An ALJ is "not bound by findings made by State agency or other program physicians . . ., but [he] may not ignore these opinions and must explain the weight given to the opinions in their decision." *Id*. at *5. These opinions can be given weight, however, "only insofar as they are supported by evidence in the case record." *Id*. at *6.

### 1.    DRS. SMITH, CHAMBLY, AND WARREN

As the ALJ noted in his opinion, Dr. Smith opined that, among other things, Plaintiff "could follow simple [one] or [two] step jobs instructions, and could relate to the public, co-workers, and supervisors" (Docket No. 12, pp. 26, 394 of 571). Likewise, Dr. Chambly found Plaintiff "able to understand, remember, follow and maintain concentration, persistence and pace for one and two-step jobs tasks" (Docket No. 12, p. 475 of 571). A review of Dr. Chambly's assessment, done by Dr. Vicki Warren, Ph.D ("Dr. Warren") affirmed Dr. Chambly's findings (Docket No. 12, p. 507 of 571).

24

Plaintiff argues that these findings preclude the ALJ from allowing Plaintiff to do four-step job activities in his residual functional capacity assessment (Docket No. 13, pp. 12-14 of 19). Plaintiff is incorrect.

Under Social Security regulations, "[u]nless a treating source's opinion is given controlling weight, the [ALJ] must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant . . . ." 20 C.F.R. § 404.1527(e)(2)(ii). This is logical: an ALJ must base his opinion on the medical evidence and opinions contained within a claimant's record. When the ALJ assigns controlling weight to the opinion of a claimant's treating physician, it is easy for the claimant to understand how the ALJ arrived at his conclusion, whatever it may be. Without this controlling weight, however, a claimant is left to wonder about the basis for the denial of benefits.

Here, ALJ Barnett discussed but discounted the opinion of Dr. Smith, stating that the "severe limitations provided by Dr. Smith were based, in part, on the adverse affect of the claimant's continued drug usage (the record shows the claimant smokes marijuana regularly . . .). His report included no diagnostic findings . . . ." (Docket No. 12, p. 26 of 571). Likewise, the ALJ discussed but discounted the opinion of Dr. Chambly, stating, "[it] appears she adopted Dr. Smith's language of '[one] to [two] step tasks' which find to be not fully supported by the record as a whole" (Docket No. 12, p. 26 of 571). ALJ Barnett went on to find that

> Dr. Smith's language indicates the claimant's ability to follow simple one or two step job instructions 'would appear to be good,' i.e., he would have no problem performing this work. However, the residual functional capacity assessment should be the *maximum* the claimant can perform. Dr. Smith does not say this is the maximum the claimant can perform, or even that he cannot perform more detailed or complex work. Indeed, the mental status examination he gave to the claimant showed good results.

(Docket No. 12, p. 26 of 571) (emphasis in original).

As stated above, when determining a claimant's residual functional capacity, the Commissioner

25

must base his assessment on all relevant medical and other evidence. 20 C.F.R. § 20.1545(a)(3).

However, while the Commissioner must *consider* the opinions of medical and psychological

consultants, the Commissioner is not *bound* by the opinions of these consultative medical examiners.

20 C.F.R. § 404.1527(e)(2)(i). Therefore, just because both Drs. Smith and Chambly mentioned one or

two step jobs in their evaluations of Plaintiff does not mean that ALJ Barnett was required to limit

Plaintiff to *only* one or two step jobs in his determination of Plaintiff's residual functional capacity. In

fact, nothing in the record would suggest that Plaintiff was limited to such tasks.

Plaintiff's mental health treatment history is minimal. He first presented with mental health

issues in March 2007 to the Nord Center (Docket No. 12, p. 348 of 571). At that time, Plaintiff

described himself as depressed and complained of difficulty falling asleep and intrusive worry

thoughts (Docket No. 12, p. 348 of 571). Based on an assessment, Nord Center staff found Plaintiff to

be anxious and agitated with rapid speech, although his thoughts were logical (Docket No. 12, p. 360

of 571). His insight and judgment were poor (Docket No. 12, p. 360 of 571). Plaintiff was diagnosed

with adjustment disorder with mixed anxiety and depressed mood and alcohol abuse (provisional) and

assigned a GAF score of sixty, indicating moderate symptoms (Docket No. 12, pp. 357-58 of 571).

Plaintiff had only three additional sessions and, in July 2007, requested his case with the Nord Center

be closed given his disagreement with treatment recommendations (Docket No. 12, p. 431 of 571).

Specifically, Plaintiff disagreed with the suggestion that he seek treatment for his marijuana use

(Docket No. 12, p. 429 of 571). Plaintiff admitted this during his hearing testimony (Docket No. 12,

pp. 58-59 of 571).

Plaintiff did not seek additional mental health treatment until May 2009 when he first saw Dr.

Zeck (Docket No. 12, p. 510 of 571). Even then, Plaintiff only participated in three counseling sessions

(Docket No. 12, p. 510 of 571). Dr. Zeck described Plaintiff as a "negative pessimistic individual who had nothing positive to say about anybody or any situation" (Docket No. 12, p. 511 of 571). He noted that Plaintiff was overactive and had difficulty sitting still and focusing, but could only provisionally diagnose Plaintiff with bipolar disorder and PTSD (Docket No. 12, pp. 511-12 of 571).

During his session with Dr. Smith in August 2007, Dr. Smith found Plaintiff to be cooperative, friendly, and verbally coherent and fluent, not requiring much prompting to speak (Docket No. 12, p. 393 of 571). Dr. Smith also noted Plaintiff was direct, to the point, and well-organized in his thinking (Docket No. 12, p. 393 of 571). Plaintiff's ability to maintain attention and concentration was "fairly good," as was his ability to follow simple one to two-step job instructions (Docket No. 12, pp. 393-94 of 571).

In October 2009, Dr. Chambly found Plaintiff only moderately limited in his ability to carry out detailed instructions and able to carry out one- and two-step job tasks (Docket No. 12, pp. 473, 475 of 571). She also found Plaintiff had only moderate difficulties in maintaining concentration, persistence, or pace (Docket No. 12, p. 469 of 571). During his hearing testimony, Plaintiff admitted that he was not currently receiving any mental health treatment nor has he ever been on medication for any mental health conditions (Docket No. 12, p. 54 of 571). When asked if there was any part of his condition that affected his ability to concentrate and pay attention, Plaintiff stated that, although his brain sometimes raced, nothing affected his ability to concentrate (Docket No. 12, pp. 54-55 of 571). When asked why he stopped working, Plaintiff cited only his physical health issues (Docket No. 12, pp. 43-44 of 571). Even when Plaintiff mentions mental health issues, he only mentions depression; he cites no difficulty with concentrating or performing tasks (Docket No. 12, pp. 194-302 of 571).

Although Plaintiff would have preferred the ALJ impose stricter limitations on his residual functional capacity, this Magistrate finds there to be substantial evidence to support the ALJ's current opinion. "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)). Therefore, this Magistrate finds Plaintiff's fourth and fifth assignments of error to be without merit and recommends the decision of the Commissioner on this issue be affirmed.

### 3.    PARAGRAPH B CRITERIA AND RESIDUAL FUNCTIONAL CAPACITY

Plaintiff next argues that the ALJ failed to properly account for Plaintiff's moderate mental limitations, found in the "Paragraph B" criteria, in his hypothetical questions and corresponding residual functional capacity assessment (Docket No. 13, pp. 15-17 of 19). Defendant contends that Paragraph B criteria are not equivalent to a residual functional capacity finding and are therefore not required to be made part of that assessment (Docket No. 14, pp. 17-18 of 21). The magistrate agrees.

As ALJ Barnett noted in his decision,

[t]he limitations identified in the Paragraph B criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps [two] and [three] of the sequential evaluation process. The mental residual functional capacity assessment used at steps [four] and [five] of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders Listings in 12.00 of the Listing of Impairments.

(Docket No. 12, p. 23 of 571); *see also* SSR 96-8p, 1996 SSR LEXIS 5, *13 (July 2, 1996) ("[t]he adjudicator must remember that the limitations identified in the 'paragraph B' . . . criteria are not a [residual functional capacity] assessment . . . . ). For the case at hand, and contrary to what Plaintiff would have this Court believe, just because Dr. Chambly found Plaintiff had moderate difficulties in

28

maintaining social functioning, concentration, persistence, and pace does *not* mean that the ALJ was required to make corresponding findings when assessing Plaintiff's residual functional capacity. This fact is further emphasized by the fact that neither Drs. Lewis, Smith, or Zeck found Plaintiff to have similar limitations (Docket No. 12, pp. 391-94, 419, 510-12 of 571). Therefore, Plaintiff's sixth assignment of error is without merit and the Magistrate recommends the decision of the Commissioner on this issue be affirmed.

### 4.    PLAINTIFF'S CREDIBILITY

Finally, Plaintiff alleges that ALJ Barnett failed to reasonably evaluate Plaintiff's subjective symptoms, treatment, work history, or activities of daily living (Docket No. 13, pp. 17-18 of 19). Plaintiff goes on to accuse the ALJ of using only "boilerplate" language in his assessment of Plaintiff's credibility, which Plaintiff deems to be "judicially disapproved" (Docket No. 13, p. 19 of 19).

Under Social Security regulations, a claimant's subjective complaints of pain or other symptoms are not, on their own, conclusive evidence of a disability. 42 U.S.C. § 423(d)(5)(A). However, a claimant may experience pain severe enough to restrict his ability to work. In such cases, an ALJ must evaluate the credibility of a claimant's allegations. Social Security Ruling 96-7p provides the framework under which an ALJ must analyze a claimant's credibility. The Ruling states, in part:

> In determining the credibility of a claimant's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.
>
> It is not sufficient for the adjudicator to make a single, conclusory statement that the individual's allegations have been considered or that the allegations are (or are not) credible. It is also not enough for the adjudicator simply to recite the factors that are

29

> described in the regulations for evaluating symptoms. The determination must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

1996 SSR LEXIS 4, *2-4 (July 2, 1996). The ALJ's findings as to a claimant's credibility are entitled to deference. *Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 736 (N.D. Ohio, 2005).

Here, ALJ Barnett found Plaintiff's subjective statements of pain to be incredible (Docket No. 12, p. 27 of 571). As noted by the ALJ, Plaintiff testified that he cannot be on his feet for more than an hour without pain and no more than three hours per day total (Docket No. 12, pp. 23, 44 of 571). Plaintiff has to frequently change positions to alleviate his back pain, including spending time lying down, sitting, and standing (Docket No. 12, pp. 23, 44 of 571). Plaintiff lies down one to two hours per day (Docket No. 12, pp. 23, 44 of 571). He has difficulty bending, lifting, and carrying (Docket No. 12, pp. 24, 50 of 571). Plaintiff testified that his hands are always cold and his fingertips often go numb (Docket No. 12, pp. 23-24, 48 of 571).

However, as ALJ Barnett noted, Plaintiff has never been on prescription pain medication for his pain and in fact refused pain medication (Docket No. 12, pp. 27, 56 of 571). He refused physical therapy (Docket No. 12, p. 554 of 571). Plaintiff can often sleep through the pain and, when asked, only rated his pain at a level four or five out of ten (Docket No. 12, pp. 51, 56 of 571). Radiological scans done in 2006 showed only mild degenerative changes in Plaintiff's mid and lower dorsal spine and a normal lumbar spine (Docket No. 12, pp. 337-38 of 571). In April 2009, Plaintiff reported to Dr. Eldridge that his back only "sometimes hurt" (Docket No. 12, p. 485 of 571). In fact, scans done in May 2009 showed minimal arthritic changes with no fracture or soft tissue swelling, mild distal thoracic anterior wedging, and a relatively normal lumbar appearance (Docket No. 12, pp. 438-40,

30

486-88 of 571). During his BDD-ordered evaluation with Dr. Saghafi in January 2010, Plaintiff did not complain of any pain in his joints or any numbness, tingling, or weakness in his extremities (Docket No. 12, p. 492 of 571). In December 2010, Dr. Amirneni reported that Plaintiff had normal gait, muscle tone, and strength (Docket No. 12, p. 557 of 571). A couple of months later, in February 2011, Plaintiff had normal thoracic and lumbar spine scans (Docket No. 12, p. 560 of 571).

Based upon a complete review of the record, it is clear that Plaintiff's actions do not seem to correspond to his reported level of pain. Therefore, Plaintiff's seventh assignment of error is without merit and the Magistrate recommends the Commissioner's decision on the issue of Plaintiff's credibility be affirmed.

## VIII. CONCLUSION

For the foregoing reasons, this Magistrate recommends the decision of the Commissioner be affirmed.

       s/Vernelis K. Armstrong<br>
United States Magistrate Judge

Date:   October 28,  2013

## IX. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the Local Rules for Northern District of Ohio, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in United States v. Walters, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In Thomas v. Arn, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.